Thank you, Your Honor. May it please the Court, I'm John Minster. I represent the plaintiff appellant Veronica Duran Martinez. This is a Section 1983 deadly force case. It's an appeal from a grant of summary judgment in the District Court. This Court's review is de novo. In our brief, we contend, and I would contend today, that the summary judgment order should be reversed and that this case should be tried by a jury. The jury should decide whether it was reasonable or not to shoot Ms. Martinez. Kind of as an initial proposition, when did the seizure take place? Well, there's two seizures in the record. One is when the car was pulled over and the driver and the passenger were held, I think, for 30 to 35 minutes at the side of the road. The second seizure took place. Well, did they stop having the seizure when he took the car and drove away? The seizure, well, at that point, Ms. Martinez had been shot. So when the car was in motion, it wasn't really driven away because the driver, Cristino, had been hit by two bullets and the car had... Someone had to start the car to move. Pardon me? Someone had to start the car to move. Well, the record shows that he turned on the ignition and the shots were fired. The shots were the second seizure in the case. I should note that Judge Kunauer found that my client was seized for purposes of the Fourth Amendment, and I don't see that ruling being challenged in the appeal in this case. Was his ruling that the seizure took place when she was shot? He found that a seizure occurred. I think he had in mind that the seizure took place when she was shot. I'd have to go back and look at the order. Now, I'd like to review the points that I made in the brief very briefly for your consideration and invite any questions. First is that we contend there were genuine issues of fact as to the shooter's claim that he had to fire three shots in order to save the lives of the other officers at the scene. Under plaintiff's facts and as indicated in the video, two of the shots were fired after the officers who had reached into the car to grab the wheel or grab the ignition had withdrawn their hands from the car. No one except the shooter drew a weapon or perceived the situation to warrant that. So the officers were clear of the car when the second and third shots were fired. A jury could find, based on the videotape and the testimony of the officers, that at the very least the second and third shots were fired when the officers were not in imminent danger of death or serious bodily injury. And, of course, they could also find that the fact that the officers reached into the car to grab the ignition key did not in and of itself place them in such danger as to warrant the shooting of the driver and certainly, of course, not the passenger. Do you know which shot hit your client? The record would support an inference by the jury that the third shot hit my client. And the reason for that is the forensic evidence would indicate that the first shot embedded itself in the driver's side door. The second shot was a superficial wound which passed through the front of Mr. Cristino's chest. It was not the lethal wound. And the third shot was a through and through, a left to right shot entering his chest cavity, coming out the other side, and going into my client's abdomen. So the record would support, the autopsy would support, and the forensic evidence of the scene would support a conclusion by the jury that it was the third shot that hit my client. Counsel, do you have a case to support your argument that each shot should be analyzed separately? There is a, yes, I do. There's Ellis v. Wynalda, which says when an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity. Also, Abraham. Does that case say that each shot should be analyzed as a separate use of force? Yes. I mean, it says you can't keep, if you have, let's say you have a justified, let's say a first shot is justified. You can't, you don't retain the right to continue the shooting thereafter with impunity. The same goes with Abraham v. Razo, which is the Third Circuit case that cites the Ninth Circuit's decision in Hopkins v. And, Ellis, will you point me to the specific language that you contend supports your argument that these shots, which were fired in rapid succession, should be treated as three separate uses of force? Point me to the language in Ellis that supports that argument. I don't have Ellis with me. I'm sorry. The language that I would be relying on is in my brief on page 27, and the language from Abraham v. Razo is also in my brief on page 27. But I don't know if they didn't bring the cases themselves with me. I would also... Hopkins treats as, deals with separate volleys of shots. Hopkins v. Zendaya. Hopkins does deal with two groups of volleys. That's true. And so it treats them as separate incidents, but they were separated by several minutes, as I recall. That's true. However, it provides support for my contention that each trigger pull... I don't think there's any testimony that this was an automatic pistol that the officer was wielding, that each trigger pull ought to be analyzed. There's one other point that is perhaps inherent in the questions that you're asking, and that is if you assume for the sake of argument that the shooting of the driver was valid. You assume that for the sake of argument. We dispute that, but the judge in essence applied his ruling in the previous case that the shooting was valid. Does that automatically mean that the shooting of other people in the car is likewise valid? In other words, if an officer has grounds to shoot one person in a car, does the car become a free-fire zone? And we contend in our brief that it does not, and that whether there were grounds to shoot the passenger has to be considered. In other words, if the officer chooses to shoot... No, but isn't there evidence here that the shot that hit the passenger passed through the driver? Definitely. I think the shot that hit the passenger passed through the driver, but it's also undisputed that the shooter knew that the passenger was there and was sitting in the seat and was in the line of fire. You know, when you lean back like that to look at me, you come out of the picture. Oh, I'm sorry. The best thing is to just address the court. Okay. It's the best way. Okay. Just ignore it. Okay. Even though the video is over there. Yeah, just talk forward. Okay, I'm sorry. I'll talk with you. It's just habit, I guess. You know, you talk to the face. Yeah, I understand. I understand, but you sort of fade out of sight, so this is better. Okay. Thanks. But anyway, we were talking about the passenger. If the shot is aimed at the driver and then it accidentally hits the passengers, which looks like what happened here, then your argument about justification for shooting the passenger sort of falls by the wayside, doesn't it? Not at all, because the shooter knew that the passenger was there and he was aiming at both of them. They were sitting next to each other. This had been a stop that had lasted 30 to 35 minutes. The shooter could see the passenger. I think if you look earlier in the video, you'll see the shooter. At one point, he was on the passenger's side of the car, so to say that she was accidentally shot, I think, is inaccurate. He was shooting at both of them, and he hit both of them. He wanted to stop the driver. I mean, that was his priority, and he conceded that the passenger posed no threat to him. What evidence is there that he possibly wanted to hit the passenger? Well, the jury could infer that a person intends the natural and probable consequences of their acts. He knew the passenger was there. He was shooting through the driver's side window in a left-to-right direction, so really it was almost inevitable that he was going to hit the passenger, and a jury could infer that he decided that she could be collateral damage. The point I'd like to make is even if you were to agree that the shooting of the driver was justified, which I don't, the passenger, there were no grounds under the Fourth Amendment to shoot the passenger, and the passenger is entitled to compensation under Section 1983. Even if the shooting of the driver was valid. What would you say is the officer should have done in a situation like that? They've got somebody who's suspected of serious crime who looks like he's about to start the car against orders and is about to take off, possibly endangering the various officers that are near the car or vehicle or in front of the vehicle or partway into the vehicle. What are they supposed to do at that point? Well, first of all, it is true that two officers put their hands into the car, but as they testified, they realized that that was a bad idea and they withdrew them momentarily, and the video demonstrates that. Secondly, police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force. The jury could find that the officer should... Did you hear my question? I did. What were they supposed to do? Oh, okay. What were they supposed to do? Okay, so don't cite me cases. I'm saying, you know, if you got in front of a jury, you would say, look, they shouldn't have shot. This is the thing they should have done. And what is this thing they should have done in your view? Number one, they shouldn't have reached into the car to turn off the ignition. Number two, you can't use deadly force to stop a fleeing felon. That's what Tennessee v. Garner is all about. There was a, I think Mr. Garner was climbing over a wall after killing a burglar. Just let the car drive away? Better to let the car to drive away than to kill the driver. That's right. And that's what Garner is about. Better to let the kid who had committed the burglary climb over the fence than shoot him down as he was scaling the fence. That's what it says. Garner says it's better to let the felon escape than to kill him. That's a fundamental principle of our Fourth Amendment jurisprudence. So, yes, they shouldn't have reached for the keys, and they should have let the driver get away. This was not an escaped murderer who was armed. This was a suspect in a drug case who happened to have just been identified by another suspect. We have a little over two minutes left. Do you want to save some time for rebuttal? I would very much like that. Thank you, Your Honor. Let's hear from the opposing counsel. May it please the Court, my name is Andy Cooley. Police shootings occur in a tense and rapid and three-dimensional environment where we expect police officers to make split-second decisions about the safety of others, about their own safety, about whether to use less than lethal force and whether to use lethal force. In many cases where we have a cold record, a two-dimensional record, the parties will parse these split seconds, breaking them down moment by moment in an attempt to analyze what happened. Does our record show us where the shooting officer was? Both the video and the testimony establish that Officer Feeney was in a cover position, it's called, near the driver's side tire. In fact, his foot was run over by the tire as he was discharging his firearm. Conflicting evidence on that. There was testimony that there was no mark on his boot. Well, yeah, but the reason it's not conflicting and the reason it would be improper to draw an inference that that means no tire ran over the foot is because there wasn't evidence that tires leave marks on military steel-toed black boots. And that's why I thought there was an example of the plaintiff stretching the inference because it wasn't reasonable to draw that inference. When did the car move in relation to when the shots were fired? It began to move as the vehicle started. That was what concerned Officer Feeney. He began to draw his service weapon. As he got it up, the car began to jerk forward, and it was moving before the shots were fired. I think that's well established by looking at the video evidence. Then the shots, there is no clear record as to which sequence of shots, how they went. One shot went into the A pillar. It was not recovered. Two other shots entered the vehicle, one striking Mr. Vargas and remaining in him and one passing through and through. We don't know whether that was the first shot or the third shot. When was the passenger seized? Well, it's our position that there was an investigatory detention was the basis for the vehicle being stopped. It's pointed out in this case that we didn't take the keys from this car. Perhaps in hindsight, taking the keys would have prevented this felon from trying to escape. Did it take place when the identification was made? Did it ripen into a seizure at that point? I believe the only seizure that occurred for Fourth Amendment arrest purposes would be the shooting by Officer Feeney of Mr. Vargas, the driver. Ms. Duran was not seized because the actions against her were unintended and accidental. And Sacramento v. Lewis tells us that where the police intend force, the object of that intended force is seized. But where they do not intend force, and it's an accident, that is not an intended Fourth Amendment seizure. In your view, what justified the use of deadly force in this case? There were two threats faced in this circumstance. One was the series of officers who had reached into the vehicle, entangled with the vehicle and risked being dragged, dragged to their death possibly. The second was- The video seemed to show that their hands were gone before all this happened. Is that right? They were gone. They were pulled out of the driver's compartment at the time the third shot was fired. That's true. The problem with that is- How do we know that it was when the third shot was fired? I watched the video a couple times. Well, we know there were three shots in less than two seconds. We know that sometime- Where were the hands in relation to- You're saying that in relation to the first two shots that the hands were still in the car? I don't know if I could even break it down that easily. They were being moved out during the shooting. And I would concede that for the third shot, the hands were out of the car. The third shot, of course, came during the period where Officer Feeney's foot was also being run over. But what I find, and I believe the court should affirm Judge Kunaur on, is that asking Officer Feeney, as he's evaluating all of these developing circumstances, the totality of circumstances that we're supposed to look at when we're using deadly force, to be able to calculate that these officers, whose hands were in there and were at this risk, had actually extricated themselves and the threat to them had ended, in time for him to make the decision, I'm going to stop my trigger finger, is one that is not supported in any case law and in any analysis. This is a case where there was no expert testimony to suggest that Officer Feeney did anything wrong. We would be left with merely the arguments of Mr. Menster, counsel for the plaintiff, as to what the officers should do under these circumstances because there was no evidence. Could a jury decide that these officers were really not in danger, they could all jump back and be out of the way? No, a jury could not decide that at the moment Officer Feeney made the decision to use lethal force, that their danger did not exist. That would be based on the video evidence. The danger of what? The danger of the officers whose hands were in and around the front of the vehicle being dragged to their death, the danger of Officer Feeney being run down if the vehicle turned in his direction, the danger of Officer Feeney's foot being trapped in the vehicle running over him in that period as well. This is Scott V. Harris all over. We have a video evidence that says, parsing this act down into the second and third shots and expecting any police officer to be able to analyze that at the moment of the third shot's decision was made, there was no danger is unreasonable. That's part of the reason why this court can affirm Judge Kuhnauer on the basis of qualified immunity. We know from the Supreme Court's decision in Brousseau v. Haugen that in circumstances involving a police officer versus vehicle shooting, in that case, of course, a case handled by my office, Officer Brousseau was shooting at a vehicle. It was a vehicle where there were no officers entangled with it. It was a vehicle that was not driving toward her. It was driving away from her. And she was worried about other officers in the vicinity being hit by the car. The Supreme Court said that that act fell in the hazy border between constitutional and unconstitutional action, and therefore she deserved qualified immunity. In this case, we would have a better situation because Officer Feeney was faced not only with a danger to other officers, like Officer Brousseau faced, but also a danger to himself, and in a much tighter quarters than was the record in Brousseau v. Haugen. So that's why this is a case where you can affirm, Judge Kuhnauer, this is a de novo review on the basis that Officer Feeney deserves qualified immunity for his acts. Let's remove from the equation the danger to the officers. Let's say there were no hands in the car and no foot under the tire. They're in the middle of an investigatory stop with a suspected drug deal, I believe. That was the information they had. And as the officers are maybe sort of looking away, so they're not right in the line, he turned on the engine and starts to drive away. If that modification of the facts is made, would there be a justification for the shooting? No. Tennessee v. Garner says that police officers can use deadly force against a fleeing felon only where that felon is suspected of a violent crime and is at risk of serious bodily injury or death to others if they're not stopped. The difference between Tennessee and this case, or at least one difference, is that here he's got a vehicle and is initiating what might be a flight from a police chase, whereas as I recall in Tennessee this was a young man on foot, right? That's correct. But you don't rely on the danger to the community from a fleeing truck as a justification for the shooting. It is the danger to the officers' immediate presence is that entire justification. Yes. I don't want to put words in your mouth. I just want to make sure I understand your position. You're correct, Judge Kuczynski, that at least most of my agencies would declare that shooting at a vehicle that's merely a suspect in a crime and trying to flee from them would be unreasonable force, and they wouldn't use a firearm in that circumstance. Firearms are particularly ineffective against vehicles. Tires are made with Kevlar, the same material that bulletproof vests are made with, and police officers would use their vehicles as a cover position because they will withstand bullets. And so typically it's been proven to be ineffective to use a firearm against a car, and it wouldn't be used if it was a drug crime and a person was simply fleeing from the police with no bystanders or other people directly in the line of danger. Brousseau v. Haugen was a circumstance where there were other officers in the vicinity circling the house that the suspect was at, and when he drove away, the shooter in that case was concerned that these other officers would emerge into the path of the fleeing vehicle, and that was the mindset that she had at the time she used her firearm in that case and shot not at the vehicle but at the driver himself to stop him. Are there other questions from the panel? That concludes the argument that I have prepared to make. Judge Kuhnhauer relied heavily on the Brouwer case. Do you think it's applicable here? I disagreed with that part of his analysis, that we would basically use a transferred intent analysis onto the passenger because I think analytically it's Sacramento v. Lewis that should control here and that we should analytically be looking at what is the intended target for Fourth Amendment purposes and then we analyze the officer's justification as to the intended target and not as to accidental targets. And so I didn't agree with that analysis. I think Sacramento is what controls. I just think we have that same view. Well, I hope you'll adopt it in your own direction. Thank you, counsel. Thank you very much. Rebuttal, please. Thank you. In response to the last interchange, I looked up Judge Kuhnhauer's order, and he did rely on Brouwer, noting that Brouwer says a seizure occurs even when an unintended person or thing is the object that the detention are taking. And he said that given Brouwer's focus on the intentionality of the means rather than the specific result, it's not difficult to conclude that a seizure took place in the present case. The defendant, Feeney, was attempting to shoot Vargas, who was propelling the car. He intentionally applied the means by which the plaintiff was wounded, and I think that distinguishes Sacramento versus Lewis, which I think is that that's a car chase case, and there's a crash that results, but it's not a situation where the officer's pulling the trigger and shooting at two people that he knows are in the car. The medical examiner opined, and this is discussed in my brief, that there was the superficial wound to the chest when Mr. Vargas is sitting up, and then he opined that the likely scenario is that after the first superficial wound struck, as Mr. Vargas doubled or reclined forward, he received the second shot from which it was actually the third shot. He received the second shot, which hit him, which entered his left upper back. He was shot in the back, according to the medical examination. Both shots came from the left to the right, and it's the shot that went into his back through his abdomen, which is the shot that hit my client, that being the third shot. I don't have any other comments to make. Expert testimony is not required in these cases. The jury decides reasonableness, and the circuit has repeatedly held that in excessive force cases, except in rare occasions, the decision as to the actions of the officers, the question of reasonableness should be resolved by a jury. It's evident just from the argument of counsel that there are disputed facts and there are disputed inferences which can be drawn from those facts. Summary judgment should be reversed. Thank you. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Hudson v. Trigon.
judges: Kozinski, Fletcher, Rawlinson